IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| Byron Grimm, *Individually,* and *as Administrator to* the Estate of Kenneth Grimm, deceased,<br>*Plaintiff,*<br><br>*Versus*<br><br>Guadalupe County, Texas; and Deputy Gary Courtney, *Individually*;<br>*Defendants.* | Civil Action No. 5:25-cv-1555<br><br>(Jury Trial) |

**PLAINTIFF'S ORIGINAL COMPLAINT**

**TO THE HONORABLE JUDGE OF THE COURT:**

Now comes Plaintiff BYRON GRIMM, *Individually,* and *as Administrator to* the Estate of Kenneth Grimm, deceased, complaining of DEPUTY GARY COURTNEY, and of GAUDALUPE COUNTY, TEXAS, for the violation of his and the late Kenneth Grimm's Fourth and Fourteenth Amendment rights, as well as his rights under the Americans with Disabilities Act. He respectfully shows the Court as follows:

**OVERVIEW**

1.  Kenneth Grimm (hereinafter sometimes Kenneth) was born May 26, 1947, and raised in Seguin, Texas. Upon graduating high school, Kenneth Grimm joined the United States Navy, where he served for 20 years and was honorably discharged.

2. After his retirement from the Navy, Kenneth was diagnosed with Ankylosing Spondylitis (a progressive inflammatory arthritis that fuses the vertebrae of the spine), which had been mis-diagnosed while he served in the Navy, and was awarded a 100% medical disability.

3. After retirement, he eventually returned to Seguin to raise his son and started a new career journey at Texas Lutheran University in the maintenance department, retiring as Custodial Supervisor. Kenneth was outgoing, sociable, and personable; he never met someone who he did not make a friend. He was known as a fun-loving person with a great sense of humor. He enjoyed dancing and loved entertaining people with his Navy stories. Ken Grimm was a loving husband, father, grandfather, great-grandfather, and friend.

4. August 27th, 2024, Ken was 77 years old, and still suffering from Ankylosing Spondylitis, and now Alzheimer's, dementia, Parkinson's, and loss of hearing. These ailments had a significant impact on Kenneth Grimm's health. He was not able to walk well, was extremely frail, and was confused with normal life situations. Due to his age and health, he was frail and looked frail.

5. One day, as sometimes happens with Alzheimer's and dementia patients, Kenneth became agitated and cut his arm. Due to his overall state of health, the family decided to call 911 *for medical assistance* as they felt Kenneth required treatment. They informed the dispatcher of the situation — Kenneth's cut, his Alzheimer's and dementia, and his agitated state.

6. Defendant Guadalupe County Sheriff's Deputy Gary Courtney (hereinafter sometimes Deputy Courtney) was dispatched to the scene, and within approximately 80 seconds of exiting his vehicle on arrival, he shot and killed Kenneth. During that approximately 80 seconds, Deputy Courtney: was made aware of Kenneth's health status; observed Kenneth's slow, frail, and vulnerable physical condition; and observed Kenneth comply with his instruction to drop a frying pan. Nevertheless, because Kenneth was holding a kitchen knife, Deputy Courtney

quickly escalated to using deadly force and shot Kenneth twice in the chest. Kenneth never threatened Deputy nor anyone else with the knife either verbally or through body language, and was not in close enough proximity to anyone to use the knife against them in his slow, frail, and confused state. Basically, Kenneth seemed confused and appeared he just wanted to surrender the knife. There was also a gate between Deputy Courtney and Kenneth that Deputy Courtney had previously opened, and easily could have closed, but didn't.

## JURISDICTION AND VENUE

7. This Court has jurisdiction under 28 U.S.C. § 1331 federal question jurisdiction because this case arises under 42 U.S.C. § 1983 for an alleged violation of Plaintiff's civil rights. Jurisdiction also exists under 28 U.S.C. § 1343(3) to redress the deprivation of Plaintiff's civil rights.

8. Venue is proper in this Court under 28 U.S.C. § 1391(b) because the Defendants reside within the District, and the incident at issue took place in and about Seguin, Texas, in the District.

## PARTIES

9. Plaintiff Byron Grimm is a resident of Guadalupe County, Texas, and Kenneth Grimm's son.

10. Defendant Deputy Gary Courtney is sued in his individual capacity, and he may be served with process at 2617 N. Guadalupe Street, Seguin, Texas 78155, or wherever he may be found.

11. Defendant Guadalupe County, Texas is a governmental body existing under the laws of the State of Texas and may be served with process by serving the Guadalupe County Judge Kyle Kutscher at 101 E. Court Street, Seguin, Texas 78155.



## ADDITIONAL FACTS

12. Kenneth Grimm was born and raised in Seguin, Texas.

13. He was a proud veteran of the U.S. Navy, where he served for 20 years:

14. He also served his community and loved people; after his career in the Navy, he became the Custodial Supervisor at Texas Lutheran University.

15. By 2024, Kenneth was 77 years old, and suffered from Ankylosing Spondylitis, Alzheimer's, dementia, Parkinsons, and loss of hearing. Due to his age and health, he appeared

vulnerable and frail. His ailments significantly impacted his physical motor skills and also his mental abilities.



16.     On the evening of August 27th, 2024, as sometimes happens with Alzheimer's and dementia patients, Kenneth cut his arm, and the cut needed to be looked at. And as sometimes happens with Alzheimer's and dementia patients, Kenneth was agitated, which made it difficult for his family to treat his cut. Thus, as anyone would do, his family called 911 for medical assistance, and informed the dispatcher of the situation — Kenneth's cut, his Alzheimer's and dementia, and his agitated state.

17.     In response to the 911 call for medical attention, Defendant Guadalupe County Sheriff's Deputy Gary Courtney was dispatched to the scene. He was equipped by Defendant

Guadalupe County with a duty pistol and collapsible baton, but not a taser as was policy and practice.

18. Upon arrival, Deputy Courtney is met by Lorie Chupp, who informs him of the situation and Kenneth's condition, and notes that he is blocked from leaving the front of the house.

19. As Courtney approaches the back of the house with Chupp, Kenneth is seen exiting the house, escorted by his granddaughter Peyton Story, and holding a frying pan in one hand. Although the frying pan is dented, he is not using it as a weapon at that time, and Story is with him.

20. Deputy Courtney opens the previously closed back gate and asks Kenneth to drop the pan. Kenneth complies with the request.

21. Story stops walking as Kenneth slowly continues forward down the path toward the gate, and Kenneth produces a kitchen knife from his back pocket while he is still several paces away from the gate. Deputy Courtney draws his duty weapon in response and instructs Kenneth to drop the knife.

22. Neither Story nor Chupp were afraid of Kenneth at any point during the encounter, nor did they believe that he was a threat to them in any way. But they were afraid due to Deputy Courtney drawing his weapon, as Story was at risk of being hit by an errant bullet. She slowly moves to the side after Deputy Courtney draws his weapon.

23. Deputy Courtney had ample room to step backwards and ample time to close the gate as Kenneth slowly walked toward him. Deputy Courtney deliberately chose to hold the gate open and not step back until he fired his weapon. Deputy Courtney did not attempt to de-escalate the situation whatsoever aside from shouted instructions to drop the knife. Deputy Courtney also did not clarify that he would use deadly force absent Kenneth's immediate compliance.

24. Kenneth's path took him well out of reach of Story, but not close enough to Deputy Courtney or Chupp to endanger them, especially given the fence and his condition.

25. Approximately 4-5 seconds elapsed between Deputy Courtney's first instruction for Kenneth to drop the knife, and Deputy Courtney shooting and killing Kenneth. During that time span, Kenneth never verbally or physically threatened anyone with the knife. Kenneth did not lunge at Deputy Courtney or anyone else. At the time he was shot and killed, Kenneth did not pose an imminent or immediate threat to anyone. Throughout those 4-5 seconds, Kenneth appeared confused as he shuffled slowly toward Deputy Courtney, and, if anything, appeared to be surrendering the knife to Deputy Courtney in his confusion.

26. From the time Deputy Courtney exited his vehicle until the time he shot and killed Kenneth, approximately 80 seconds had elapsed.

27. Deputy Courtney was not equipped with a taser at the time, and Guadalupe County does not issue tasers to its deputies (after this incident, the Guadalupe County Commissioners Court voted to get tasers for all deputies). Courtney was equipped pursuant to Guadalupe County's policies on law enforcement equipment.

28. Because Deputy Courtney lacked any other means of engaging Kenneth from a safe distance, he was only left with his duty weapon. If he had a taser available to him, he could have easily incapacitated Kenneth, safely disarmed him, and taken him to receive the medical care he needed. Deputy Courtney also made absolutely no effort to talk to Kenneth in non-aggressive manner and persuade Kenneth to drop the knife. If de-escalation tactics had been employed or, if necessary, a taser used instead of the service weapon, it is most likely Kenneth would be alive today.

29. Peace officers are typically trained to create distance and seek cover or concealment when faced with a potential threat. But prior to shooting Kenneth, Deputy Courtney held the

gate open so he could fire at Kenneth, which added to Kenneth's confusion as to what he was supposed to do, as he was also very hard of hearing and oftentimes used hearing aids. Deputy Courtney had ample means and opportunity to avoid the slow-moving Kenneth.

30.     Deputy Courtney holding the gate open was also consistent with the appearance that Deputy Courtney was inviting Kenneth to keep walking towards him. And as noted previously, Deputy Courtney did not warn Kenneth that he would be shot for failing to drop the knife. Taken together, Kenneth walking toward Deputy Courtney was entirely consistent with surrendering the knife to Deputy Courtney, just as he had previously discarded the frying pan he had been holding.

31.     Upon preliminary review, Plaintiff's expert also noted that due to Kenneth's observed infirmities (Ankylosing Spondylitis, Alzheimer's, dementia, Parkinson's loss of hearing, slow walking pace, and confused expression), Deputy Courtney, more likely than not, could have mitigated any immediate threat by simply closing the gate, creating distance, time, and physical separation between himself and Kenneth, thus allowing time for de-escalation dialogue to occur. As noted previously, only 4-5 seconds elapsed between Deputy Courtney's orders to drop the knife and the first shot fired at Kenneth. Peace officers are trained to de-escalate before using deadly force whenever possible. Given such a short interaction with Courtney, Kenneth may not have fully comprehended the deputy's orders.

32.     Moreover, Deputy Courtney advised his dispatcher that shots had been fired and requested EMS, but never rendered any first aid to Kenneth, despite the fact that Kenneth did not immediately die upon being shot.

## Claims

33.     Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

34.     The Fourth Amendment to the Constitution reads, in relevant part, as follows:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

35. The Fourteenth Amendment to the Constitution reads, in relevant part, as follows:

> No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

1. **Excessive Use of Deadly Force and Due Process under the 4th and 14th Amendments**

36. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

37. The Fourth Amendment protects the People against "unreasonable searches and seizures." The "touchstone" of Fourth Amendment analysis "is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.'" *Pennsylvania v. Mimms*, 434 U.S. 106, 108-109 (1977) (per curiam) (quoting *Terry v. Ohio*, 392 U.S. 1 (1968)).

38. With respect to deadly force the 5th Circuit has made it clear that officers may not shoot and will not be entitled to qualified immunity where there is no immediate threat to officers or immediate threat to others. *See, e.g., Cole v. Carson*, 935 F.3d 444, 452–53 (5th Cir. 2019) (en banc); *Baker v. Putnal*, 75 F3d 190, 198 (5th Cir. 1996). The *en banc* 5th Circuit in *Cole* denied the defendant officers qualified immunity where they shot and killed a suicidal teenager that had a gun out and pointed at his own head. *Cole*, 935 F.3d at 455. It held that when a person "poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend [them] does not justify the use of deadly force to do so," that a warning before the use of deadly force is required "where feasible," and that crossing these

lines by themselves can be sufficiently obvious violations without depending on other caselaw. *Id.* at 453 (quoting *Tennessee v. Garner*, 471 U.S. 1, 11–12 (1985)) (cleaned up).

39. Kenneth's life was taken from him without due process of law, and deadly force was used against him despite the fact that he did not pose an immediate threat to anyone at any point during the encounter. Although Kenneth was instructed to drop the knife, he was not issued a clear warning that deadly force would be used for failure to comply, especially given his dementia and Alzheimer's, of which Deputy Courtney was aware. Beyond the shouted instructions to drop the knife, there were no attempts to de-escalate the situation.

### 2. Municipal Liability

40. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

41. Municipal entities may be liable for their official, written policies, for their customs and practices that may be fairly considered *de facto* policies, and for their failure to adopt policies where needed. *See Webb v. Town of Saint Joseph*, 925 F.3d 209, 214–15 (5th Cir. 2019); *J.K.J. v. Polk County*, 960 F.3d 367, 370, 375–76, 384 (7th Cir. 2020) (en banc); *Glisson v. Indiana Department of Corrections*, 849 F.3d 372, 378–80, 382 (7th Cir. 2017); *Woodward v. Corr. Med. Servs.*, 368 F.3d 917, 929 (7th Cir. 2004).

42. Here, Guadalupe County's failure to provide its deputies with tasers or an appropriate alternative is deliberately indifferent to the needs of its constituents, who, like Kenneth, are at risk of facing deadly force when lesser force would be appropriate, but is not available as a result of Guadalupe County's policies.

43. As Plaintiff's expert notes, according to the largest manufacturer of Tasers, AXON, more than 18,000 law enforcement agencies in 80 countries use Tasers as an intermediate weapon to provide alternatives to police officers and reduce the need to use deadly force. Guadalupe County Sheriff's Office (GCSO) has no policy addressing the use of Tasers. Failing

to provide sufficient intermediate weapons to patrol staff, more likely than not, increases the risk that a GCSO deputy may choose to use their firearm because they have no other alternatives for less lethal actions. While Deputy Courtney did have a collapsible baton, officers are generally discouraged from using a baton in this kind of situation because it requires the officer to move closer a person holding a knife.

44. Municipal liability may also arise for failure to train police officers when "the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378 (1989).

45. A single constitutional violation may be sufficient to prove deliberate indifference when officers are placed in "recurring situations that present an obvious potential for violation of constitutional rights and the need for additional or different police training." *Gabriel v. City of Plano*, 202 F.3d 741, 745 (5th Cir. 2000) (citing *Board of County Comm'rs of Bryan County, Okla. v. Brown*, 117 S. Ct. 1382, 1390 (1997)).

46. Here, there is an obvious potential for constitutional violation when officers encounter those with mental impairments and/or are experiencing a mental crisis, but, on information and belief, Guadalupe County does not provide appropriate training or policies so that *all* its officers can safely handle those situations.

47. Moreover, Deputy Courtney received training on using force at a rate of at least 5 times that of de-escalation or less-lethal force training.

48. GCSO recognizes the need for policy in both of these areas — less-than-lethal force and mental health crisis response — by providing less-than-lethal options (a shotgun with non-lethal rounds and long-range pepper spray) to *some* of its officers, but not all of them, and by contributing to a part-time mental health unit along with the Seguin Police Department. However, by limiting training and equipment in these areas of need to a small number of its

officers, it takes a gamble that the officer responding to any given call will be appropriately equipped and trained to handle the situation. As a result, it is mathematically inevitable that situations like the present case arise: an officer responds to a scene for which he is under-equipped and under-trained. When these situations arise, GCSO unnecessarily and unconstitutionally risks the safety of its own officers and its constituents, as well as the constitutional rights of its constituents.

49. Put differently, GCSO recognizes that its officers may face situations where the choice between a baton and a duty pistol is not enough. It also recognizes that some situations require sending officers trained to deal with mental health crises in order to maximize the chance to successfully de-escalate and safely resolve the situation. In this case, Kenneth and his family would have been best served by an officer with mental health crisis and de-escalation training, as well as an officer with an intermediate, less-than-lethal option beyond a baton. But by limiting those resources, it creates an obvious hole in its policies whereby an officer like Deputy Courtney responds to the situation. In doing so, it gambled with Kenneth's life that, under-equipped and under-trained, Deputy Courtney would safely handle the situation anyway.

50. Independently of the *Monell* claims, Guadalupe County may also be liable when it ratifies the unconstitutional conduct of its officers.

51. The Fifth Circuit recognizes that a refusal to reprimand or discipline known misconduct is a "subsequent acceptance" of the conduct that "tends to prove [the policymaker's] preexisting disposition and policy." *Grandstaff v. Borger*, 767 F.2d 161, 171–72 (5th Cir. 1985).

52. On information and belief, Guadalupe County reviewed this deadly use of force incident at the time, but issued no reprimand or any form of corrective action to Deputy Courtney, and thus accepted his conduct as its own. Specifically, then-Sheriff Zwicke noted that he

reviewed the body camera video recorded by Deputy Courtney, and stated that he would not have done anything differently.

### 3. Liability under the Americans with Disabilities Act

53. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

54. The Americans with Disabilities Act (ADA) Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Congress enacted Title II to extend the protections of the Rehabilitation Act to state and local governments, specifically stating that the remedies, procedures, and rights under the Rehabilitation Act are also available under Title II. *Hainze v. Richards*, 207 F.3d 795, 799 (5th Cir. 2000).

55. "To succeed on a failure to accommodate claim, a plaintiff must prove: (1) he is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered entity; and (3) the entity failed to make reasonable accommodations." *Smith v. Harris Cty.*, 956 F.3d 311, 317–18 (5th Cir. 2020) (internal citations omitted).

56. Kenneth was clearly a qualified individual with a disability due to his Alzheimer's, dementia, Parkinson's, and mobility limitations.

## Damages

57. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

## Attorney's Fees

58. Plaintiff is entitled to recover attorneys' fees and costs to enforce his Constitutional rights under 42 U.S.C. §§ 1983 and 1988.

## Jury Trial

59. Plaintiff requests a trial by jury on all issues triable to a jury.

## Prayer for Relief

60. Plaintiff respectfully requests that the Court:

   A. Enter judgment for the Plaintiff and against the Defendants, jointly and severally, holding the Defendants liable;

   B. Find that Plaintiff is the prevailing party in this case, and award attorneys' fees, expenses, and costs pursuant to federal law against the Defendants;

   C. Award compensatory damages for Plaintiff against Defendants jointly and severally for the violations of civil rights under the U.S. Constitution;

   D. Award pre- and post-judgment interest;

   E. Award declaratory and injunctive relief against Defendants if such relief is reasonable and just; and

   F. Grant any other such further relief that is reasonable and just to which Plaintiff shows entitled.

Respectfully submitted,

*/s/Randall L. Kallinen*
Randall L. Kallinen
Kallinen Law PLLC
State Bar of Texas No. 00790995
511 Broadway Street
Houston, Texas 77012
Telephone: 713.320.3785
Fax: 713.893.6737
Email: AttorneyKallinen@aol.com

Alexander C. Johnson
KALLINEN LAW PLLC
State Bar of Texas No. 24123583
511 Broadway Street
Houston, Texas 77012
Telephone:   573/340-3316
FAX:         713/893-6737
Email:       alex@acj.legal

ATTORNEYS FOR PLAINTIFF

**Attorney for Plaintiff**